UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cv-00232-RJC-DSC

| | |
|---|---|
| PHYLLIS GASTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | ORDER |
| ANSON COUNTY SCHOOL DISTRICT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** comes before the Court on Defendant's Motion for Sanctions, (Doc. No. 46), and Motion for Summary Judgment, (Doc. No. 48), and the parties' associated briefs and exhibits.[1] The Magistrate Judge issued a Memorandum and Recommendation ("M&R") on Defendant's Motion for Sanctions, (Doc. No. 58), recommending that Defendant's Motion for Sanctions be granted due to Plaintiff's failure to comply with discovery and failure to appear at her deposition. Plaintiff filed a timely Objection to the M&R, (Doc. No. 60). After having been fully briefed, the motions are ripe for adjudication.

---

[1] In responding to Defendant's Motion for Summary Judgment, Plaintiff submitted three responses—all of which are largely identical. (See Doc. Nos. 53–55). She then submitted a Surreply to Defendant's Reply Brief, which again, included the same substance already stated in her former responses. (See Doc. No. 59). For purposes of this Order, the Court construes Doc. No. 55 as the operative responsive brief to Defendant's Motion for Summary Judgment.

1

I. BACKGROUND

   A. Factual Background

The following facts are undisputed, or when disputed, are taken in the light most favorable to Ms. Phyllis Gaston ("Plaintiff"). In 2014, Plaintiff was enrolled in the Graduate Teaching Program at the University of North Carolina at Charlotte ("UNC Charlotte" or "UNCC"). In August 2014, Plaintiff informed individuals at UNC Charlotte that she had "secured a full time teaching position in order to be certain that [she would] be prepared for the Spring, 2015 course." (Doc. No. 50-3 at 5). On November 14, 2014, Plaintiff met Marty Godwin, the Assistant Superintendent and Human Resources ("HR") Administrator for Defendant Anson County Board of Education ("Defendant" or "the Board"),[2] at a UNC Charlotte career fair. (Doc. No. 1 at 9). Mr. Godwin and Plaintiff discussed the potential of Plaintiff teaching at Anson County in the Spring. In this initial conversation, Plaintiff represented that she intended to serve as a full time lateral entry teacher[3]

---

[2] Although the Complaint names the Anson County School District as the defendant, the correct name of the entity is Anson County Board of Education.
[3] Mr. Godwin has submitted a declaration testifying to the requirements for lateral entry licensure:

> For a school system to apply for a lateral entry license for a teacher during the 2014-2015 school year, the teacher must have shown the school that she has a bachelor's degree from a regionally-accredited college or university. The teacher must also show one of the following: (a) her degree was relevant to the area in which she was teaching (e.g. a bachelor of science in biology for a biology teacher) and she received a 2.5 GPA or better for the course of study towards that degree; (b) she had at least 24 hours of course work and five years of relevant work experience; or (c) she passed North Carolina State Board of Education

2

and indicated that she had the necessary qualifications to serve in this capacity. (Doc. No. 1 at 9; Doc. No. 52 at 1).

On November 26, 2014, Plaintiff submitted a job application to Defendant that made the following representations:

> (1) Plaintiff had one year of experience teaching high school English;
> (2) Plaintiff had completed three months of student teaching/internship under the supervision of teacher Kendl Bostleman in seventh grade English/Language Arts during the 2012–2013 school year;
> (3) Plaintiff anticipated receiving a teaching license on May 31, 2015 through a "College/University program" and would apply for the license when she was eligible.
> (4) Plaintiff had received "State Advanced Certification" as highly qualified in English and Reading and Language Arts.

(Doc. No. 52-1 at 3–6). However, none of the materials on file with the Board or with UNC Charlotte show that Plaintiff had one year of experience teaching high school English or that she had ever received a certification as a highly qualified teacher. Moreover, Plaintiff had not completed three months of student teaching in the spring of 2013; rather, she received a grade of "W" and no credit for her student teaching in 2013. (Doc. No. 50-3 at 3). Thus, it appears that Plaintiff misrepresented her qualifications on her application to the Board.

On December 3, 2014, the Board created a "New Hire Alert" for Plaintiff, which listed her job title as a substitute teacher, with an hourly pay of $98/day. (Doc. No. 52-2 at 2). Because Plaintiff had no certifications at the time the Board

---

    licensure exams, achieved certain standardized test scores, and met certain GPA requirements.

(Doc. No. 52 ¶ 10). Mr. Godwin stated these requirements are based on the State Board of Education's rules as provided in 16 N.C. Admin. Code 6C.0305 (West 2014; last amended Jan. 2, 2006). (Id. ¶ 11).

3

hired her, the term certified was crossed out.  (Id.).  At Plaintiff's behest, the Board's HR Supervisor, Joy Drake, signed a letter on December 4, 2014, stating that Plaintiff was "employed with Anson County Schools as an 8th Grade English Language Arts teacher effective December 3, 2014.  This is a full time position." (Doc. No. 51-1 at 3).  This letter was supposedly provided to UNC Charlotte to release Plaintiff from her teaching program at UNC Charlotte.  (Doc. No. 51 ¶ 3).

Because Ms. Drake had been informed that Plaintiff qualified for a lateral entry license, Ms. Drake gave Plaintiff a draft of a "Temporary Full-Time" form contract.  (Doc. No. 1 at 10; Doc. No. 51 ¶ 5).  Ms. Drake noted on the unofficial copy that the "official contract w[ould] be available after December Board Meeting." (Doc. No. 51-2 at 2).  Because Plaintiff never provided the Board with the necessary materials for the Board to apply for lateral entry licensure on her behalf, the Board hired her as a full-time, uncertified, substitute teacher, (Doc. No. 51 ¶ 6; Doc. No. 51-3 at 2; Doc. No. 52 ¶ 13).  Plaintiff acknowledged this status on April 2, 2015 after Ms. Drake informed Plaintiff that she was not invited to the new teacher orientation because she was "not being paid as a certified teacher yet" and that Plaintiff would "be invited to attend in August once [her] license ha[d] cleared licensure."  (See Doc. No. 51-4 at 2).  Defendant alleges that after Plaintiff had begun teaching at Anson County Middle School, the Board became aware that

4

Plaintiff was attempting to complete her student teaching internship—a UNC Charlotte field experience course–while being paid as a full-time substitute.[4]

The record is replete with Plaintiff's negative performance reviews while teaching at Anson Middle School.[5] Despite consistent feedback, Plaintiff did not seem to heed the Board's recommendations for improvement. Ultimately, Plaintiff received two formal write-ups from the Board in April 2015—one for leaving her class in the hands of another teacher without obtaining prior authorization to do so, and the second for being the only staff member to not complete the mandatory, assigned safety training modules.

---

[4] In March 2015, Plaintiff's University Supervisor wrote the school principal inquiring about Plaintiff's performance: "I am just making sure that [Plaintiff] is meeting standards. She must have them met by the end of the internship in April." (Doc. No. 50-5 at 2). After Plaintiff's outburst on April 28, 2015, Mr. Godwin characterized Plaintiff to UNC Charlotte as "a UNCC student that is substituting." (Doc. No. 53-7 at 2).

[5] See Doc. No. 52-3 at 5 (noting, after observing Plaintiff teach on March 20, 2015, that Plaintiff's performance was "below standard on each of the four standards observed during the observation" and characterizing her relationships with students as "adversarial and confrontational"); id. at 8 (asking Plaintiff to refrain from placing "students in the hallway for disciplinary reasons" and leaving them unsupervised); id. at 9 (issuing Plaintiff a formal write-up on April 2, 2015 for opting to not teach her class and instead choosing to work on her grades: "This is completely unacceptable and unprofessional to choose to not teach your class to work on grades, especially without permission from administration."); id. at 10 (instructing Plaintiff that "[h]aving unpredictable and inconsistent expectations on homework isn't a best practice" and asking her to "[p]lease correct this immediately"); id. at 12 (attempting to give Plaintiff feedback on April 2, 2015 and asking Plaintiff to "provide an explanation of why [she was] not complying with . . . expectations that have been communicated in multiple instructional coaching sessions, classroom feedback, post-observation conferences, and in writing . . . ."). See also Doc. No. 52-4 at 7 (threatening to issue Plaintiff a second formal write-up on April 2, 2015 because she was the "the only staff member that ha[d] not completed the assigned [safety training] modules").

On April 24, 2015, the school principal Mr. McLaurin informed Plaintiff that she was being reassigned from her full time English/Language Arts class to the Computer Lab. (Doc. No. 52-5). Plaintiff alleges that prior to this reassignment, Plaintiff had "reported numerous incidents of sexual and general harassment"[6] and that she was preparing "to write up a group of white male students for another incident of sexual harassment" on April 24, 2015—the same day she was reassigned. (Id.).[7] Her reassignment was to be effective starting Monday, April 27, 2015, and Mr. McLaurin instructed Plaintiff to "[s]ee Mrs. Harrington first thing on Monday morning to get the key . . . ." (Id.). On April 27, 2015, instead of reporting to the computer lab as instructed, Plaintiff went to her former classroom and "found a substitute teacher in her English/Language Arts classroom." (Doc. No. 1 at 11). Subsequently, Plaintiff left the school early and went to HR and visited with her University Supervisor at UNC Charlotte. (Doc. No. 50-7 at 2). Plaintiff alleges that

---

[6] See generally Doc. No. 1 at 13–14 (alleging incidents of supposed harassment).
[7] None of these alleged reports are documented in the record, except for Plaintiff's own allegations in her Complaint. "Such general 'assertions, standing alone, are insufficient to sustain an actionable Title VII claim.'" Huggins v. N.C. Dep't of Admin., No. 5:10-CV-414-FL, 2013 WL 5201033, at *8 (E.D.N.C. Sept. 13, 2013), aff'd sub nom. Huggins v. NC Dep't of Admin., 554 F. App'x 219 (4th Cir. 2014) (quoting Gilliam v. S. Carolina Dep't Of Juvenile Justice, 474 F.3d 134, 143 (4th Cir. 2007)). Notably, however, Plaintiff has not identified these supposed instances of reporting harassment as the protected activity for which Defendant retaliated against her. (See Doc. No. 55 at 1 (claiming that she engaged in protected activity on April 27, 2015 when she allegedly reported being subjected to "discrimination, harassment, and a hostile working environment" to HR)). Therefore, because the alleged reports lack substantiation, and because Plaintiff has not argued that the reports constituted protected activity, the Court does not consider these alleged reports for purposes of this Order.

when she arrived home on April 27, 2015, her Anson County School email account had been deactivated. (Doc. No. 1 at 12). The next day on April 28, 2015, when Plaintiff arrived at work, she alleges that her ID card had been deactivated. (Id.). When Plaintiff was let into the building, she discovered that a substitute had been requested for the Computer Lab. (Id.). Subsequently, Plaintiff demanded that she speak with Mr. Adams, the assistant principal. (Id.). Multiple witnesses have testified to the fact that Plaintiff interrupted a closed-door meeting between Mr. Adams, a parent, and a student. (See generally Doc. No. 52-6). The record establishes that Plaintiff caused a public disruption in front of school personnel, students, and at least one parent—shouting and accusing both the principal and assistant principal of being white supremacists and threatening that she intended to file a lawsuit. (id.). After this scene, Plaintiff alleges that she went and spoke to Ms. Drake, requesting that Ms. Drake give Plaintiff her contract. (Doc. No. 1 at 12). Ms. Drake did not comply with Plaintiff's request, allegedly informing Plaintiff that she was a substitute. (Id.).

The date of Plaintiff's termination, and whether Plaintiff was terminated at all, are disputed. Plaintiff alleges that Mr. Godwin called Plaintiff on May 8, 2015 and informed her that she had been terminated. (Id. at 13). On the contrary, Defendant alleges that Plaintiff was never terminated. (Doc. No. 49 at 13). Rather, Defendant claims that Plaintiff was merely removed from its system in January 2016, when the Chief Financial Officer for the Board was reviewing certain records and realized that Plaintiff had not been separated or terminated. (Doc. No. 51-5).

After being alerted to this, the Board's superintendent directed that May 1, 2015—Plaintiff's last pay date—be considered Plaintiff's last day of employment and also directed that Plaintiff be "deactivate[d]" as a substitute "if that ha[d] not been done yet." (See id.). On May 7, 2015, the Board informed UNC Charlotte that it would not be able to provide a student teaching certification for Plaintiff for the following reasons:

> (1) Formal student teacher arrangement protocol was not followed by UNCC nor Mr. Gaston[;]
> (2) Ms. Gaston's application [the Board] ha[d] on file indicate[d] that she ha[d] completed student [teaching] prior to becoming a substitute teacher for [the Board]; and
> (3) [Ms. Gaston] d[id] not have a contract with ACS.

(Doc. No. 53-7 at 4). Mr. Godwin explained that the decision reflected that "normal student teaching is addressed through the HR department with signed documentation" and that Plaintiff's position as a substitute teacher "did not meet the criteria of the UNCC program." (Id. at 3).

### A. Procedural Background

On May 1, 2017, Plaintiff sued Defendant and other various school personnel, alleging employment discrimination claims arising out of her work at Anson Middle School. (Doc. No. 1). On May 19, 2017, all individual defendants were terminated, leaving the Board as the sole Defendant. After Defendant filed its Motion to Dismiss, (Doc. No. 11), the Court dismissed all of Plaintiff's claims but for her retaliation claim. (Doc. No. 22). Defendant answered Plaintiff's Complaint on March 9, 2018. (Doc. No. 23). A mediation occurred on June 27, 2018, but the parties reached an impasse. (Doc. No. 31). On August 8, 2018, the Court issued its

Pretrial Order and Case Management Plan, (Doc. No. 36), setting the close of discovery as December 21, 2018.

On December 4, 2018, Defendant served Plaintiff with a notice of deposition via FedEx. (Doc. No. 42; Doc. No. 44-1 at 2–4). Three days prior to the duly noticed deposition, Plaintiff filed an Objection to Notice of and Deposition of Plaintiff Phyllis Gaston, (Doc. No. 43), complaining of factors such as time, distance, and expense, as well as Defendant's conduct at mediation. Plaintiff stated that responding to written questions should be sufficient. From the record, it also appears that Plaintiff attempted to dodge service of Defendant's Response in Objection to Plaintiff's Objection. (See Doc. No. 47-1). This document which Plaintiff refused service of warned that "[i]f Plaintiff fails to attend her deposition, the Board will seek dismissal of Plaintiff's case," citing Federal Rules of Civil Procedure 37(d)(1)(A)(i) and 41(b), which authorize the Court to dismiss a claim for failure to appear at one's own deposition and failure to prosecute. (Doc. No. 44). Plaintiff failed to appear for her deposition.

After Plaintiff did not appear for her deposition scheduled on December 20, 2018, Defendant filed its Motion for Sanctions, (Doc. No. 46), and Motion for Summary Judgment, (Doc. No. 48), on January 24, 2019. Defendant premises its Motion for Sanctions on Plaintiff's refusal to appear at her own deposition and failure to conduct discovery in this case. Indeed, it appears to the Court that Plaintiff's only effort to participate in discovery was her filing of initial disclosures on August 24, 2018, (Doc. No. 40), and then amending this filing on August 27,

2018, (Doc. No. 41). Since then, Plaintiff has not participated in any discovery. Plaintiff has not issued any written discovery, nor has she noticed any depositions, indicating a failure to prosecute a matter she initiated.

## II. STANDARD OF REVIEW

### A. Motion for Sanctions

A district court may assign dispositive pretrial matters, including motions for sanctions that ask for dismissal of an action, to a magistrate judge for "proposed findings of fact and recommendations." 28 U.S.C. § 636(b)(1)(A) and (B). The Federal Magistrate Act provides that "a district court shall make a de novo determination of those portions of the report or specific proposed findings or recommendations to which objection is made." Id. at § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983).

### B. Motion for Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which

it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment, rather it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Id. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Additionally, because Plaintiff filed her Complaint *pro se,* it must be held to less stringent standards than formal pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520–521 (1972). Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Anderson, 477 U.S. at 248–49. "If

11

the evidence is merely colorable or is not significantly probative," summary judgment is appropriate. Id. at 249–50 (citations omitted).

## III. DISCUSSION

### A. Defendant's Motion for Summary Judgment

"Title VII prohibits an employer from retaliating against a worker for either participating in a Title VII proceeding or opposing an employer's discriminatory practices." Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 255 (4th Cir. 1998) (citing 42 U.S.C. § 2000e–3(a)) (footnote omitted). Retaliation claims claims filed under Title VII, 42 U.S.C. § 2000e–3 apply the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell-Douglas framework, a plaintiff "must satisfy a three-step proof scheme":

> First, [Plaintiff] must establish, by a preponderance of the evidence, a prima facie case of retaliation. Once established, the burden shifts to [Defendant] to rebut the presumption of retaliation by articulating a non-retaliatory reason for its action. If [Defendant] meets its burden of production, the presumption of discrimination created by the prima facie case is rebutted and "drops from the case," and [Plaintiff] bears the ultimate burden of proving that she has been the victim of retaliation[.]

Laughlin, 149 F.3d at 258 (4th Cir. 1998).

    1.    <u>Plaintiff cannot establish a prima facie case of retaliation because she cannot demonstrate a causal nexus existed between her protected activity and the Board's adverse employment action.</u>

To establish a prima facie case of retaliation, Plaintiff must meet three

12

elements: "(1) that she engaged in protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action." Id. The Fourth Circuit has noted that both formal and informal grievances can constitute protected activity. "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin, 149 F.3d at 259. The Court finds that Plaintiff engaged in protected activity when she filed her report of alleged discrimination to the Board's HR personnel on April 27, 2015.[8] Thus, Plaintiff meets the first element of a retaliation claim.

Defendant argues that Plaintiff cannot establish the second element of her retaliation claim, asserting that the Board never took adverse employment action against Plaintiff because the Board never terminated Plaintiff. Rather, Defendant argues it simply "removed her from its systems more than seven (7) months later, when its CFO noted that she was still listed as a full-time substitute, but had not been paid since May 1, 2015." (Doc. No. 49). The Court is not persuaded by this argument for two reasons. First, the issues of whether Plaintiff was terminated, and if so, when she was terminated are disputed. Second, regardless of the issue of whether Plaintiff was terminated, the Court finds that Defendant took another adverse employment decision against Plaintiff. The Fourth Circuit has noted that

---

[8] This date is disputed, but for purposes of this Order, the Court adopts the date Plaintiff claims she filed the report.

13

adverse action does not only encompass termination decisions. "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (alteration and internal quotation marks omitted). "A reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." Id. at 376 (internal quotation marks omitted). Examples of an adverse action include a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Id. (internal quotation marks omitted).

Here, construing Plaintiff's claim broadly,[9] Plaintiff has put forth evidence that Defendant took adverse action against her when it reassigned Plaintiff from her full-time English/Language Arts class to the Computer Lab. Defendant argues that "[u]ltimately, Plaintiff performed so poorly as a substitute for the Anson Middle School Eighth Grade English Language Arts class that she was reassigned as a substitute in the school's computer lab." (Doc. No. 49 at 2). Because this decreased Plaintiff's level of responsibility, the Court finds that Plaintiff has established that the Board took some type of adverse action against her, even if the issue of termination, or lack thereof, is disputed.

Regarding the third element of a retaliation claim, "[t]o survive summary judgment . . . a plaintiff must have evidence from which a reasonable factfinder

---

[9] The Court is mindful of the requirement that pro se filings "however unskillfully pleaded, must be liberally construed." Noble v. Barnett, 24 F.3d 582, 587 n.6 (4th Cir. 1994).

14

could conclude that a causal connection exists between the protected activity and the adverse action." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). "To satisfy the third element, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity." Id. "Title VII retaliation claims must be proved according to traditional principles of but-for causation." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013); see also Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015). The burden for establishing causation at the prima facie stage is not an onerous one, Foster, 787 F.3d at 251; nevertheless, Plaintiff has failed to establish a causal connection because the adverse employment action preceded Plaintiff's protected activity.

Plaintiff has identified April 27, 2015 as the definitive date that she engaged in protected activity. (Doc. No. 54 at 1). While Plaintiff's reassignment did not take effect until Monday morning, April 27, 2015, the Board made the reassignment prior to Plaintiff filing her complaint with HR. This is memorialized by an e-mail the principal sent to Plaintiff on April 24, 2015, informing her that she needed "to be prepared to start" in the Computer Lab Monday morning and that she would no longer be on the "E[nglish] L[anguage] A[rts] team." (Doc. No. 52-5 at 2). Because the alleged adverse employment decision precipitated the protected activity, a reasonable juror could not find the necessary causal nexus. See Dowe, 145 F.3d at 657 ("[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.").

15

Since Plaintiff cannot prove that the Board reassigned her after becoming aware of Plaintiff's participation in protected activity, Plaintiff cannot establish that the Board "must have taken the adverse employment action *because* [she] engaged in a protected activity," and thus Plaintiff cannot establish a prima facie case of retaliation. Dowe, 145 F.3d at 657.

> 2. <u>Even assuming Plaintiff could establish a prima facie case of retaliation, Plaintiff cannot establish that Defendant's legitimate, nondiscriminatory reasons for her reassignment and ultimate termination were pretext for retaliatory animus.</u>

Even assuming Plaintiff could establish a prima facie case of retaliation, the Board has offered legitimate, nondiscriminatory reasons for Plaintiff's reassignment. As mentioned, the record is replete with evidence of Plaintiff's failure to meet the Board's legitimate expectations in her employment.[10] The record demonstrates that, despite consistent feedback and communication from school personnel that she was not meeting standards and specific suggestions for improvement, Plaintiff's poor performance persisted. Plaintiff had ample opportunities to amend course and incorporate the Board's feedback regarding her need to improve in certain core competency areas in her teaching, yet she failed to do so. After Plaintiff demonstrated her ineffectiveness in teaching and maintaining control in her English Language Arts class, the Board reassigned her to the Computer Lab. This was a legitimate, nonretaliatory—perhaps even charitable— course of action for the Board to take. Rather than terminate her, the Board chose

---

[10] See supra note 5.

16

to afford Plaintiff another opportunity at a different post.  Plaintiff has offered no evidence demonstrating that the Board's legitimate, nonretaliatory reason to reassign Plaintiff was pretextual, other than her own threadbare allegations—something insufficient for overcoming a summary judgment motion.

To the extent that Plaintiff alleges her ultimate termination was the adverse employment action taken against her, the record indicates that Plaintiff procured her employment with Defendant by making certain misrepresentations in her job application.  Defendant seems to have hired Plaintiff on false pretenses—it relied on her representations that she had had one year of experience teaching high school English and that she had received a certification as a highly qualified teacher in English and Language Arts.  The Board alleges that it did not uncover the falsity of these representations until May 2015.  Therefore, regardless of the date of termination (or removal from Defendant's system) the Court adopts, Defendant had a legitimate, nondiscriminatory reason for ending Plaintiff's employment with the Board.  And here again, Plaintiff has not put forth any evidence showing that the Board's legitimate reason for her termination/removal from its system was a pretext for retaliation.  See King v. Rumsfeld, 328 F.3d 145, 154 (4th Cir. 2003) (affirming district court's grant of summary judgment, finding that the plaintiff-teacher had failed to proffer "sufficiently demonstrative" evidence "of [the defendant's] retaliatory intent to establish that the *unrebutted* poor performance discharge motive [was] pretext); see also Springs v. Ally Fin. Inc., No. 3:10-CV-311, 2012 WL 260661, at *9 (W.D.N.C. Jan. 30, 2012), aff'd, 475 F. App'x 900 (4th Cir. 2012)

17

(finding that the plaintiff could not show that the defendant's stated reasons for her termination—one being that she had made certain "misrepresentations to [Defendant] during the hiring process—were pretext for retaliatory animus).

In sum, Title VII was "not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 260 (4th Cir. 1998) (quoting Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981)). This Court declines to question the propriety of the Board's decisions regarding Plaintiff's employment when the record evidence is overwhelming that Plaintiff failed to adequately perform in her teaching position and made certain misrepresentations to Defendant in her initial job application. Because Plaintiff cannot establish a prima facie case of retaliation, nor can she show that Defendant's legitimate, nonretaliatory reasons for reassigning and ultimately removing and/or terminating Plaintiff from its system and employ were pretext for retaliatory animus, Plaintiff's retaliation claim fails as a matter of law and entry of summary judgment in Defendant's favor is appropriate.

### B. Defendant's Motion for Sanctions

Defendant has moved for sanctions for Plaintiff's noncompliance with discovery and failure to appear at her deposition. The Magistrate Judge issued a Memorandum and Recommendation ("M&R"), recommending that this Court grant Defendant's Motion and impose sanctions. Plaintiff objected, but advanced the same arguments already included in her initial briefing. Nevertheless, the Court

has conducted a de novo review of the M&R and finds Plaintiff's objections meritless.

In its Motion for Sanctions, Defendant asked for dismissal of Plaintiff's remaining claim for retaliation, or, in the alternative, for an award of attorneys' fees and court reporting costs for the deposition Plaintiff refused to attend. (Doc. No. 46 at 2). The Fourth Circuit has repeatedly expressed a strong preference to decide claims and defenses on their merits. Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc., 616 F.3d 413, 417 (4th Cir. 2010). As such, the Court has chosen to evaluate Plaintiff's retaliation claim on the merits rather than awarding dismissal as a sanction, and therefore **DENIES IN PART** Defendant's Motion for Sanctions.

Nevertheless, the Court is disturbed by Plaintiff's choice to invoke the power of this Court yet fail to comply with certain rules of procedure. Plaintiff cannot pick and choose which legal rules she will adhere to. Defendant was clearly entitled to depose Plaintiff[11] and finds Plaintiff's unilateral refusal to appear for her deposition unacceptable. Therefore, under Federal Rule of Civil Procedure 37(b)(2) and the Court's inherent power to impose sanctions, the Court **GRANTS IN PART** Defendant's Motion for Sanctions by awarding attorneys' fees and court reporting costs for the deposition Plaintiff refused to attend.

---

[11] See Fed. R. Civ. P. 45(c)(1)(B); see also Fed. R. Civ. P. 37(d)(3) (authorizing dismissal for a party's failure to attend its own deposition).

**IT IS THEREFORE ORDERED THAT:**

1. Defendant's Motion for Summary Judgment, (Doc. No. 48), is **GRANTED**;

2. The Magistrate Judge's M&R, (Doc. No. 58), is **AFFIRMED and ADOPTED**;

3. Defendant's Motion for Sanctions, (Doc. No. 46), is **DENIED IN PART and GRANTED IN PART**. That is, denied in part as to Defendant's request to dismiss Plaintiff's retaliation claim as a sanction. Rather, the Court has chosen to adjudicate that claim on the merits. But the Motion is granted in part as to Defendant's request for attorneys' fees and costs. Plaintiff shall reimburse Defendant its attorneys' fees and court reporting costs for the deposition Plaintiff refused to attend. Defendant is **DIRECTED** to submit a subsequent pleading with accompanying exhibits documenting the amount of attorneys' fees and costs it incurred for the deposition; and

4. The Clerk of Court is directed to close this case.

Signed: June 30, 2019

Robert J. Conrad, Jr.
United States District Judge